NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY *vs.*
DEPARTMENT OF PUBLIC UTILITIES & others.

Suffolk.    March 10, 1977. — June 3, 1977.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Public Utilities.    Telephone Company.    Practice, Civil,* Review of order of department of public utilities.

A decision of the Department of Public Utilities to disallow a proposed price structure for a competitive service filed by a telephone company was supported by substantial evidence where it appeared that the proposed rate structure discriminated against customers of the company's noncompetitive services, that the ratemaking processes encouraged discrimination in favor of competitive services and that the proposed structure was therefore not in the public interest. [682-686]

A notice of hearing served by the Department of Public Utilities on a telephone company which stated that proceedings would be held to investigate "the propriety of the rates and charges" contained in the company's proposed tariff accorded the company sufficient notice of the issues involved in the proceeding. [686]

A decision of the Department of Public Utilities to disallow certain tariff revisions proposed by a telephone company contained an adequate statement of reasons therefor within the meaning of G. L. c. 30A, § 11 (7). [686-687]

372 Mass. 678           679

New England Telephone & Telegraph Co. *v.* Department of Pub. Utils.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on May 19, 1976.

The case was reserved and reported by *Kaplan, J.*

*Robert D. Bruce* (*Ora E. Smith* with him) for the plaintiff.

*Walter H. Mayo, III,* for the defendant.

*Bruce P. Saypol* of New York (*Thomas B. Arnold* with him) for the interveners.

HENNESSEY, C.J. The New England Telephone and Telegraph Company (NET) appealed, under G. L. c. 25, § 5, from a final order of the Department of Public Utilities (department) which disapproved certain tariff revisions proposed by NET. International Business Telephones, Inc., and North American Telephone Association (interveners) were allowed to intervene. A single justice of this court reserved and reported the case to the full court without decision. We conclude that the department's order was valid and that NET is not entitled to relief.

In May, 1975, NET filed with the department tariff revisions which would provide for the addition to NET's product line of a private branch exchange system known as Dimension PBX. NET proposed to offer two plans whereby customers could pay for Dimension PBX services. Plan II (not at issue on appeal) is a conventional, month-by-month payment plan. Plan I is a two-tiered plan involving payment of a fixed amount for a specified period of time (tier A rate) and payment of a variable amount for the period during which the equipment is in service (tier B rate). In June, 1975, the interveners, an association of companies which provide private branch exchange equipment and one of its members doing business in Massachusetts, filed a complaint and a motion for leave to intervene in the department's proceedings, which motion was granted. The department issued a notice of hearing in January, 1976, and subsequently held seven days of hearings at which NET and the interveners presented evidence. Its decision, rendered in April, 1976, rejected the two-tiered rate structure (plan I) and accepted the conventional

680 372 Mass. 678

New England Telephone & Telegraph Co. *v.* Department of Pub. Utils.

monthly payment rate structure (plan II), allowing revised rates for plan II to be filed.

The department made the following findings. Dimension PBX is a sophisticated communications system which uses computer programming to provide telephone services custom made to the needs of individual customers. Under plan I, NET proposes a price for this product which contains two independently determined charges. Tier A rates are designed to recover capital costs. The level of these rates and the time period for their payment are established contractually when service is implemented and, while tier A rates may vary from customer to customer, they may not be varied for each customer. Tier B charges are designed to recover on-going costs. NET may vary these charges to meet cost of service fluctuations. NET decided that Dimension PBX units would have a useful life of ten years and structured tier A rates to recover capital costs in ten years.

The department commented that the proceeding in this case involves "broader issues of public policy than the appropriateness of Dimension PBX rates." It noted that, although NET dominates the PBX market, competitive suppliers have entered this product area since 1968 when a Federal Communications Commission decision effectively required that telephone companies permit use by their customers of competitive products of this type. See *In re Carterfone Device*, 13 F.C.C. 2d 420, 424 (1968). Discussing the problems inherent in setting rates for a competitive service offered by a regulated company, the department established as its policy avoidance of high rates which artificially encourage new suppliers and overcharge customers, as well as avoidance of low rates, which may entail cross-subsidization of customers using a competitive service by customers using other telephone services. It approved a higher level of return on investment for competitive products than it permits for other NET services. It also found that "NET has a positive incentive to engage in anticompetitive and cross-subsidy pricing practices," because the department calculates NET's intrastate rev-

372 Mass. 678 681

New England Telephone & Telegraph Co. *v.* Department of Pub. Utils.

enue requirements on the basis of NET's actual annual expenses and investments, and requires that income generated by the individual services (such as local exchange, State message toll, State private line and vertical services including Dimension PBX) meet NET's over-all intrastate revenue needs. This approach to rate-setting permits a revenue deficiency in one service to be offset by adjustments in rates earned from other services.

The department found that, under a ten-year plan I contract, Dimension PBX would create revenue deficiencies in the first five years of tier A payments. In an expanding market for Dimension PBX, that service could create cumulative revenue deficiencies over longer periods of time such that over-all Statewide rate-of-return adjustments might be necessary to recoup the deficiencies. Furthermore, the department noted that the fixed level of tier A payments would result in cross-subsidization by other services whenever (a) the department authorized a general increase in NET's rate of return; (b) income tax rates rose; or (c) a change in depreciation methodology produced revenue losses.

Therefore, the department decided that the two-tiered plan unjustly discriminates against other classes of ratepayers. It decided that the absence of a long-term contract payment plan did not substantially affect the marketability of Dimension PBX, given NET's experience in the field and its own testimony as to the product's superiority. The department then rejected the two-tier pricing approach.

NET argues, in essence, that defects in the two-tier price level do not warrant rejection of the two-tier price structure and that the department's decision erroneously relied on competitive (antitrust) considerations rather than on the statutory public interest standard prescribed by the Legislature. NET argues that the department violated various statutory requirements (1) by failing to give adequate notice of the issues to be considered at its hearing, (2) by failing reasonably to explain its decision, and (3) by making a decision which lacks substantial eviden-

tiary support, is based on error of law, and constitutes abuse of the department's discretion.

We conclude, to the contrary, that the department acted within its statutory authority to disapprove rates which are unjust, unreasonable and otherwise discriminatory and that substantial evidence exists in the record to support its decision. In addition, we conclude that the department followed procedures which complied with the requirements of G. L. c. 30A and fully protected NET's rights.

1. General Laws c. 159, § 14, authorized the department to determine and fix just and reasonable rates and charges "[w]henever the department shall be of opinion, after a hearing had upon its own motion or upon complaint, that any of the rates . . . or charges . . . for any service to be performed within the commonwealth . . . are unjust, unreasonable, unjustly discriminatory, unduly preferential, in any wise in violation of any provision of law, or insufficient to yield reasonable compensation for the service rendered."[1] NET is made subject to this departmental authority by G. L. c. 159, § 12 (*d*). The department decided, after a hearing, that the plan I rates for Dimension PBX services are inherently discriminatory because they insulate Dimension PBX customers from cost increases and shift the burden of any future PBX revenue deficiencies onto other classes of ratepayers. Moreover, it found that NET has an incentive to discriminate in favor of customers of its competitive services. Accordingly, the department determined that conventional monthly payment

---

[1] In addition, G. L. c. 159, § 20, amended through St. 1973, c. 816, § 1, provides that when any change is proposed in any rate schedule, after a hearing, "the department may make . . . such order as would be proper in a proceeding under section fourteen. At . . . [a] hearing involving any proposed increase in any rate . . . the burden of proof to show that such increase is necessary to obtain a reasonable compensation for the service rendered shall be upon the . . . [telephone company]." St. 1973, c. 816, § 1. Thus, c. 159, § 14, sets forth the general standard for departmental rate disapprovals and § 20 imposes a lower standard for departmental disapproval of rate increases. Since NET proposed two-tier PBX rates for the first time, we conclude that the § 14 standard applies to the department's rate disapproval.

372 Mass. 678                                              683

New England Telephone & Telegraph Co. *v.* Department of Pub. Utils.

plans result in just and reasonable rates for this service.

In deciding whether to uphold the department's order disallowing the two-tiered payment plan, this court applies the standard of review set forth in G. L. c. 30A, § 14 (7).[2] *New England Tel. & Tel. Co.* v. *Dept. of Pub. Utils.*, 371 Mass. 67, 71 (1976). NET maintains that the department's decision violates § 14 (7) (*c*), § 14 (7) (*e*), and § 14 (7) (*g*).

Rejection of the plan I price structure was not an abuse of discretion. Even though less restrictive alternatives may exist to deal with the discriminatory aspects of two-tiered pricing,[3] the department is not required to choose the

---

[2] General Laws c. 30A, § 14 (7), as appearing in St. 1973, c. 1114, § 3, provides in part: "The court may affirm the decision of the agency, or remand the matter for further proceedings before the agency; or the court may set aside or modify the decision, or compel any action unlawfully withheld or unreasonably delayed, if it determines that the substantial rights of any party may have been prejudiced because the agency decision is — (*a*) In violation of constitutional provisions; or (*b*) In excess of the statutory authority or jurisdiction of the agency; or (*c*) Based upon an error of law; or (*d*) Made upon unlawful procedure; or (*e*) Unsupported by substantial evidence; or (*f*) Unwarranted by facts found by the court on the record as submitted or as amplified under paragraph (6) of this section, in those instances where the court is constitutionally required to make independent findings of fact; or (*g*) Arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.

"The court shall make the foregoing determinations upon consideration of the entire record, or such portions of the record as may be cited by the parties. The court shall give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it."

[3] NET points out that public utility commissions in several States have responded to the discriminatory aspects of two-tiered price structures by expressly retaining jurisdiction over tier A rates, despite the fact that these rates are fixed by contracts between the utility supplier and its customers. In those jurisdictions, consequently, cross-subsidies by other service classifications can be avoided by raising tier A rates when they become noncompensatory. See, e.g., Re S. New England Tel. Co. Docket No. 760719 (Conn. Pub. Utils. Control Auth., Jan. 17, 1977); Re New York Tel. Co., 12 P.U.R. 4th 446, 455-456 (1975) (N.Y. Pub. Serv. Commn.). While commissions in most States have chosen, apparently, to permit the companies they regulate to offer two-tiered price plans as a method of payment for PBX services, this approach elsewhere does not affect our decision as to the legality of the department's decision to disallow such a plan.

least restrictive price structure. Chapter 159, § 14, mandates a just, reasonable, and nondiscriminatory rate structure. This court will not overrule departmental action merely because the department used one approach in its decision-making rather than another, as long as the resultant decision is not confiscatory or otherwise illegal. See *Boston Gas Co.* v. *Department of Pub. Utils.*, 367 Mass. 92, 102-103 (1975); *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 360 Mass. 443, 456 (1971). NET does not claim that the monthly rates permitted by the department are confiscatory.[4]

Substantial evidence, within the meaning of G. L. c. 30A, § 14 (7) (e), supports the department's decision to disallow NET's two-tiered payment structure. Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. G. L. c. 30A, § 1 (6). *Katz* v. *Massachusetts Comm'n Against Discrimination*, 365 Mass. 357, 365 (1974). The record underlying the department's conclusion in this case includes witness testimony, studies performed by NET, and departmental staff analysis of plan I rates and economic theory. Staff analysis and opinions were introduced in evidence as required by G. L. c. 30A, § 11. See *Wannacomet Water Co.* v. *Department of Pub. Utils.*, 346 Mass. 453, 470 (1963).

This evidence indicated that plan I rates, as proposed, could result in short term revenue deficiencies in the Dimension PBX service classification and that plan I could create future revenue deficiencies in that service by insulating its customers from likely future rate increases.[5] In addition, the department's experience with its own

---

[4] Nonetheless, the department analyzed the impact of its decision on NET's ability to perform in the PBX marketplace and found, on the basis of witness testimony, that NET would be unharmed by the decision to disallow plan I.

[5] This evidence also indicated that plan I would bestow on Dimension PBX customers benefits not available to other classes of NET customers. However, we need not decide here whether such evidence alone warrants a conclusion that the proposed rate plan is discriminatory and supports a rejection in toto of the proposed rate structure.

372 Mass. 678 685

New England Telephone & Telegraph Co. *v.* Department of Pub. Utils.

ratemaking processes demonstrated that such revenue deficiencies would be recouped from customers of other service categories, possibly through over-all rate increases necessitated by continuing Dimension PBX revenue deficiencies.[6] From this evidence a reasonable mind could conclude that the plan I price structure discriminated against customers of NET's noncompetitive services; that the ratemaking processes encouraged discrimination in favor of competitive services; and that plan I, therefore, was not in the public interest.

The department's decision was not based on error of law. NET concedes that "it is appropriate for, and indeed the duty of, the department to consider competitive factors in reviewing the proposed tariff" from the standpoint of the public interest. The public's interest in marketplace competition, we agree, is well established. The record clearly indicates that the department extensively considered the important issue of cross-subsidization as well as competition in reaching its decision. Therefore, we find no support for NET's allegation that the department relied solely on a competition standard in its decision-making processes. The department's reference to the broad issues involved in this case does not refer only to issues of competition but also refers to issues such as hidden cross-subsidization which arise when the department sets rates for competitive products sold by regulated companies.

Therefore, we hold that the department's decision to disallow the plan I rate structure satisfies the requirements of G. L. c. 159, § 14, and G. L. c. 30A, § 14 (7).

---

[6] We note that cross-subsidization in the absence of an over-all rate increase presents a particularly thorny problem. Any cross-subsidization inherent in the structure of rates charged for competitive services and noncompetitive services would remain hidden unless the department periodically examined NET's rate structure for hidden cross-subsidization. While, theoretically, NET's competitors or its customers of noncompetitive services might examine periodically NET's rate structure for cross-subsidies, it seems unlikely that these persons would undertake regularly such a burdensome and technical task. Consequently, concealed cross-subsidies could exist over long periods, to the detriment of NET competitors, NET customers, and the public.

The decision was within the scope of departmental authority, and was supported by both substantial evidence and proper legal considerations.

2. We hold that the department accorded NET "sufficient notice of the issues involved [in the proceeding below] to afford . . . [it] reasonable opportunity to prepare and present evidence and argument," within the meaning of G. L. c. 30A, § 11 (1), inserted by St. 1954, c. 681, § 1. The department served on NET a notice of hearing which declared that proceedings would be held to investigate "the propriety of the rates and charges" contained in NET's proposed tariff. Nonetheless, NET argues that the department's decision rested on "broader issues," discussed above, and that the broader issues which support the department's decision comprised a department conclusion that NET had unlawfully obtained a monopoly in PBX equipment. Although the department briefly discussed the antitrust implications of NET's PBX market share, it clearly rested its decision on the evidence, discussed at 684-685, *supra,* concerning the effect of plan I on NET customers and competitors. These effects determined the "propriety" of plan I rates, and NET received adequate notice of the issues involved in the proceeding.[7]

Finally, we conclude that the department's decision includes an adequate statement of reasons therefor, within the meaning of G. L. c. 30A, § 11 (7). The department concluded in its opinion that plan I rates discriminated against customers of NET's noncompetitive services.[8] It stated that NET had a positive incentive in the face of

---

[7] We note, in addition, that NET received detailed notice of the competitive issues which were raised at the hearing below from the interveners' complaint. Moreover, the department has not relied on competitive issues on appeal and we have not considered the competitive implications of PBX rates in reaching our decision to affirm the department's decision. Therefore, NET was not harmed by the "broader issues" statement.

[8] This finding contradicts NET's charge that the department rejected plan I because it found the level of plan I rates to be too low. The department found the plan to be both noncompensatory and inherently discriminatory.

372 Mass. 678                                                687

New England Telephone & Telegraph Co. *v.* Department of Pub. Utils.

competition in the PBX market to engage in anticompetitive and discriminatory pricing practices, because the process of ratemaking permits cross-subsidization among the various NET services in order to achieve a satisfactory over-all annual revenue level. For these reasons, adequately set forth in its opinion, the department determined that plan I rates were discriminatory and that plan II provided just and reasonable rates.

3. It appears that the two-tiered pricing method is in effect in a substantial number of jurisdictions in the country. Our function, of course, is not one of substituting our judgment for that of the department. The department's brief before us relies solely on the argument that tier A rates as proposed may result in a subsidization of two-tier customers by other NET customers. If NET can propose a method by which cross-subsidization can be eliminated as a potential hazard, the department's various objections argued to us might be met. For example, it may be possible to identify and measure future deficiencies in tier A rates and it also may be possible to devise some practical method for eliminating any chance of cross-subsidization. In such a case, in effect, NET's shareholders would take the risk that the filed tier A rates would prove to be inadequate during the terms of its various agreements with customers involving the two-tiered payment plan. Alternatively, tier A rates might be made subject to adjustment in the event that there is a change in the rate of return, income taxes or depreciation, or any combination of these items, which calls for an adjustment in tier A rates so that any potential for cross-subsidization might be eliminated. NET's use of a higher rate of return on its investment in this type of equipment (a position which is accepted by the department) indicates the presence of some leeway in the rating structures tending against the possibility of cross-subsidization. However, we have rejected, as legal justification for NET's rates, the theoretical safeguard of continuing supervision of two-tiered rates by the department or by NET customers. If NET can devise a system which has a built-in safeguard, the de-

partment's concerns argued to us in support of its decision might well be satisfied.

4. The decision and order of the department are affirmed and judgment shall be entered accordingly.

*So ordered.*