NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY
vs. DEPARTMENT OF PUBLIC UTILITIES.

Suffolk. April 5, 1978. — July 18, 1978.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Public Utilities. Telephone Company. Practice, Civil,* Review of order
of department of public utilities. *Words,* "May."

Statute 1973, c. 816, § 1, amending § 20 of G. L. c. 159, was not designed
to alter the basic coverage of § 20 of describing a procedure directed
to modifications proposed by a telephone company of its existing
tariff. [31–32]
Upon the filing with the Department of Public Utilities by a telephone
company of certain proposed revisions of its tariff, and suspension
of the revisions and investigation by the department and public
hearings *as to the propriety of the* proposed rates and charges, the
department, on the date the maximum period of suspension ex-
pired, was authorized under G. L. c. 159, § 20, as amended by
St. 1973, c. 816, § 1, to disallow the proposed revisions [32–33]; the
department did not itself then fix a tariff such as would be proper
in a proceeding under c. 159 § 14, as authorized by § 20, and was not
obligated to do so. [33]

CIVIL ACTION commenced in the Supreme Judicial
Court for the county of Suffolk on May 10, 1977.

The case was reported by *Kaplan, J.*

*Richard W. Blackburn (A. Eric Rosen* with him) for
New England Telephone and Telegraph Company.

*Margot Botsford,* Assistant Attorney General, for the
Department of Public Utilities.

KAPLAN, J. New England Telephone and Telegraph
Company appeals pursuant to G. L. c. 25, § 5, from a
decision of the Department of Public Utilities disallowing
certain modifications of tariff proposed by the company.
Upon agreement of the parties, a single justice of this

376 Mass. 28 29

New England Telephone & Telegraph Co. v. Department of Public Utilities.

court reserved and reported the matter to the full court.

We turn to the facts as far as necessary. On April 14, 1976, the company filed with the department certain revisions of the part of its tariff entitled "Announcement Services" (MDPU No. 10). The effect of the revisions would be to modify the terms of an existing service called "Automatic Announcement Service" (AAS) and to introduce a variant service to be called "Public Announcement Service" (PAS).

Briefly, a subscriber to AAS under the existing tariff obtained a rather simple, light duty system by which persons calling the subscriber's number were enabled to hear announcements regarding such things as road conditions or stock market quotations which would be accompanied by the subscriber's advertising message. Rates for AAS comprised monthly charges for announcement equipment and a flat monthly rate for each line connecting the equipment to the telephone network. The company proposed by the April filing to substitute a minimum service period of six months for the existing three-month minimum in order to discourage demands for installation of the equipment for short intervals, and it proposed, further, to discontinue AAS when the equipment on hand was exhausted. PAS, as described in the filing, would be a light through heavy duty system that could handle without difficulty rapidly changing announcements such as time or time-and-temperature, and would offer a number of sophisticated features including "synchronous entry" (the caller, no matter when he calls, hears the beginning of the announcement as he comes on the line) and "traffic load protection" (there is automatic shortening of the announcement—information and advertising—when the number of calls at a particular time is so large as to crowd the lines). Rates proposed for PAS would consist of a nonrecurring charge for installation of service, monthly rates varying with the kind of announcement and type of duty, and a termination charge if the subscriber terminated service before expiration of

the minimum period applicable to the particular service. As to the relation of AAS (while it continued to be provided) to PAS, it appeared[1] that a customer could select either, if his estimated requirements were within twenty lines, he confined his announcements to certain types, and did not choose to avail himself of any of the sophisticated features; otherwise he would have to subscribe to PAS.

The proposed changes of tariff were stated to go into effect in a month's time, on May 14, 1976,[2] but on May 13 the department inaugurated DPU Docket No. 18713, entitled "Investigation by the Department on its own motion as to the propriety of the rates and charges set forth in the following: MDPU No. 10 . . . filed with the Department . . . , " and at the same time suspended the operation of the proposed rates and charges until September 14, 1976. Subsequently, by further orders, the department continued the suspension for the maximum period of ten months allowed under G. L. c. 159, § 20, that is, until March 14, 1977.

In June, 1976, the company filed its prepared testimony and exhibits to support its proposals, and in February, 1977, it filed responses to requests for information addressed to it by the department in January. On February 18 and 25, 1977, hearings were held in DPU 18713 presided over by a hearing officer with a departmental telecommunications specialist questioning rather minutely the witnesses offered on the part of the company. Further requests for information were made and answers filed. On March 14 the department rendered a decision concluding thus: "*Ordered*: That MDPU No. 10 of the Company filed on April 14, 1976 be and hereby is disallowed." The company moved for reconsideration which

[1] From the company's answer to one of the department's requests for information.

[2] The ordinary minimum period for proposed changes of rates or regulations. See G. L. c. 159, § 19, fifth sentence.

was denied on April 29, 1977, "without prejudice to the filing of a new tariff supported by any evidence available to the Company."

The department's decision expressed the concern that the rates should be based on "fully allocated costs," and, characterizing the services involved as noncompetitive or "monopolistic," insisted that the rates should be reasonably, not excessively, compensatory. Analyzing the facts adduced in the proceeding, the department sought to show that the company's proposals did not satisfy the criteria mentioned.

In its petition of appeal the company alleged as grounds that (1) the department's decision was not supported by substantial evidence; (2) under the controlling statutes the company's proposed tariffs must go into effect unless the department should find them unreasonable and unlawful and itself determine and fix lawful rates, which the department had not done; (3) the company had been deprived of significant procedural rights in the course of the proceedings.

The company has not briefed the first point about a claimed lack of substantial evidence to support the department's decision, and it is taken to have abandoned this contention.

Nevertheless, under the second point, the company argues that the proposed tariffs must go into effect because the department could not validly disapprove them without coming forward and establishing rates which it considered satisfactory (but which would, of course, be subject to company appeal). The contention turns on an interpretation of §§ 14 and 20 of G. L. c. 159, and we set out in an appendix the first paragraph of § 14 as it has long stood, and the whole of § 20 showing by conventional markings how it appeared before and after an amendment of 1973 (St. 1973, c. 816, § 1).

The line between the two sections is not perfectly clear and. for some purposes, no doubt, it is a matter of little practical importance that a clear line should be main-

32                                        376 Mass. 28

New England Telephone & Telegraph Co. v. Department of Public Utilities.

tained.[3] We think, however, that § 20 before the 1973 amendment described a procedure directed to modifications proposed by a company of its existing tariff, while all along § 14 has set out a procedure by which the department could put in question a company's existing tariff. The particular object of the 1973 amendment of § 20 was expressed in the title of the amendatory act, "An Act requiring the department of public utilities to notify the attorney general and to conduct a public hearing before making certain rate schedule changes"—referring to general increases of rates by telephone companies. But, in rearranging § 20 and distinguishing between telephone companies and other carriers, the amendment broke in on the first sentence of the section which had been indicative of its general theme. The result on a strict, literal reading would be to raise a question whether § 20 as amended speaks any longer to a proposed change of tariff by a telephone company which does not amount to a general increase of rates.

The company on the present appeal argues that the proposal to change the AAS tariff may fall to § 20 as a modification of an existing tariff, while the proposal as to PAS must be related to § 14 as a new tariff. But it is hard to force such a reading on either section. Rather we think we should say that the 1973 amendment of § 20 was not designed to alter the basic coverage of that section.

We have perhaps unduly labored the question. It should be enough to say that both parties acted under § 20 and can fairly be held to that procedure. Section 20 gives the department the right to suspend the effective date of proposed tariffs. Section 14 does not contain such a provision. The department in fact exercised a power to suspend. When time was running short in February and

---

[3] The present question was not faced in *New England Tel & Tel. Co.* v. *Department of Pub. Utils.*, 372 Mass. 678 (1977), the remarks at 682 n.1 being addressed rather to the substantive standards for approval and disapproval of rates and regulations.

March, 1977, the hearing examiner suggested that the company agree to a suspension beyond the § 20 limit of ten months, but the company stood on that section and refused.

The company goes on to contend that, even where a proceeding is within § 20, the department is without authority simply to disallow a proposed tariff, it must itself fix a lawful tariff; and if it does not do the latter, the tariff proposed by the company should be held to go into effect. That would be to read the word "may" in the fourth sentence of present § 20, referring to § 14 ("the department may make... such order as would be proper in a proceeding under section fourteen"), as the equivalent of "shall" or "must." But "shall" was used in the cognate part of § 14 (first sentence) when an imperative was wanted. A requirement that the department establish rates is understandable in § 14, for there is no stated limit of time for that proceeding; it is less plausible under § 20 where there is a time limit in which it might prove difficult for the department to go so far as to establish rates or other terms—especially so if the company should choose not to cooperate. We add that, although "may" in § 20 is not to be read as "shall" or "must," it would not necessarily protect against an abuse of discretion by the department in omitting or declining without just cause to fix a rate or the like at the conclusion of a § 20 proceeding; but no such abuse appears here.[4]

The third ground of the appeal also fails. On the present record it is not shown that there was any prejudicial lack of notice to the company about the matters in issue (see G. L. c. 30A, § 11[1]), nor that the company was entitled to receive and record its objections to a draft decision in advance of the promulgation of the final decision (id., § 11[7]).

---

[4] Nevertheless we call attention to the fact that the present proceeding might have had a happier ending if the department had so scheduled the hearings as to allow more time for interchange and mutual accommodation.

The case is remanded to the county court where a judgment is to be entered affirming the decision of the Department of Public Utilities.

*So ordered.*

APPENDIX.

### G. L. c. 159, § 14, first paragraph.

"Whenever the department shall be of opinion, after a hearing had upon its own motion or upon complaint, that any of the rates, fares or charges of any common carrier for any services to be performed within the commonwealth, or the regulations or practices of such common carrier affecting such rates, are unjust, unreasonable, unjustly discriminatory, unduly preferential, in any wise in violation of any provision of law, or insufficient to yield reasonable compensation for the service rendered, the department shall determine the just and reasonable rates, fares and charges to be charged for the services to be performed, and shall fix the same by order to be served upon every common carrier by whom such rates, fares and charges or any of them are thereafter to be observed. Every such common carrier shall obey every requirement of every such order served upon it, and do everything necessary or proper in order to secure absolute compliance with every such order by all its officers, agents and employees. If, upon investigation, the department finds that in any case it is consistent with the public interests to authorize a common carrier to make its charge for transportation less for a longer than for a shorter distance, the department may grant such authority and may from time to time modify or revoke the same."

### G. L. c. 159, § 20.

"Whenever the department receives notice of any changes proposed to be made in any schedule filed *by any common carrier not furnishing the service of transmission of intelligence by electricity* under this chapter, it may, either upon complaint or upon its own motion, and after notice, hold a public hearing and make investigation as to the propriety of such proposed changes. *Whenever the department receives notice of any changes proposed to be made in any schedule filed under this chapter which represent a general increase in rates by a common carrier furnishing the service of transmission of intelligence by electricity, it shall notify the attorney general of the same forthwith, and shall thereafter hold a public hearing and make an investigation as to the propriety of such proposed changes after first causing notice of the time, place and the subject matter of such hearing to be published at least twenty-one days before such hearing in such local newspapers as the department may select.* Pending any such investigation and the decision thereon, the department may, by order served upon the common

carrier affected, suspend, from time to time, the taking effect of such changes, but not for a longer period than ten months in the aggregate beyond the time when the same would otherwise take effect. After such hearing and investigation, the department may make, in reference to any new rate, joint rate, fare, telephone rental, toll, classification, charge, rule, regulation or form of contract or agreement proposed, such order as would be proper in a proceeding under section fourteen. At any such hearing involving any proposed increase in any rate, joint rate, fare, telephone rental, toll or charge, the burden of proof to show that such increase is necessary to obtain a reasonable compensation for the service rendered shall be upon the common carrier. If, at a hearing involving any proposed decrease in any rate, joint rate, fare, telephone rental, toll or charge demanded by any common carrier, it shall appear to the department that the said rate, joint rate, fare, telephone rental, toll or charge is insufficient to yield reasonable compensation for the service rendered, the department may determine what will be a just and reasonable minimum to be charged, and make an order that the common carrier shall not thereafter demand or collect less than the minimum so prescribed without first obtaining the consent of the department, after a public hearing."

[Italicized words were inserted by St. 1973, c. 816, § 1, approved September 21, 1973.]